**Case No. 5:19-cv-08135-EJD**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

_____

### ROBERT BROWER, SR., et al.,
*Appellants*,

vs.

### MUFG UNION BANK, N.A.,
*Appellee.*

_____

On Appeal from the U.S. Bankruptcy Court
Hon. M. Elaine Hammond
Adversary Case No. 17-05044

_____

### APPELLEE MUFG UNION BANK, N.A.'S OPENING BRIEF

_____

Isaiah Z. Weedn, SBN 229111
Sheppard Mullin Richter & Hampton LLP
650 Town Center Drive, 10th Floor
Costa Mesa, CA  92626
Tel: 714.513.5100
Fax: 714.513.5130
iweedn@sheppardmullin.com

Michael M. Lauter, SBN 246048
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA  94111
Tel: 415.434.9100
Fax: 415.434.3947
mlauter@sheppardmullin.com

*Attorneys for Appellee*
*MUFG UNION BANK, N.A.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, appellee MUFG Union Bank, N.A. states as follows:

Appellee MUFG Union Bank, N.A. is a subsidiary of holding company MUFG Americas Holdings Corporation and a member of Mitsubishi UFJ Financial Group.  Mitsubishi UFJ Financial Group, is a publicly traded company that owns 10 percent or more of Appellee's stock.

Dated:  April 24, 2020

SHEPPARD MULLIN RICHTER & HAMPTON LLP


By _____ */s/ Isaiah Z. Weedn*_____
ISAIAH Z. WEEDN
Attorneys for Respondent
MUFG UNION BANK, N.A.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ...........................9

II.  APPLICABLE STANDARD OF APPELLATE REVIEW ........................13

III.  STATEMENT OF THE CASE AND BACKGROUND FACTS ................13

    A.  The Browers ........................................................................13

    B.  Coastal ................................................................................14

        1.  Mr. Lindley's Alleged Coastal Shares. .....................16

        2.  Messrs. Nobles and Babcock Alleged Coastal Shares.............18

        3.  The Coastal (California)/Coastal (Delaware) Merger. ............19

    C.  ACP .....................................................................................20

IV.  STANDARD FOR GRANTING SUMMARY JUDGMENT ......................20

V.  ARGUMENT........................................................................................22

    A.  Issue 1: The Bankruptcy Court *Did Not Err* In Finding That
        With Regard To The Plaintiff's First Claim, the Coastal shares
        of Lindley are void for lack of consideration, pursuant to
        California Corporation Code § 409.....................................................22

        1.  Mr. Lindley Did Not Provide Consideration to Coastal In
            Exchange For His Shares.........................................................22

        2.  Void Shares Are Not Consideration For New Shares. ............25

        3.  No Bona Fide Purchaser Defense Is Applicable To This
            Case.......................................................................................25

    B.  Issue II: The Bankruptcy Court *Did Not Err* In Finding That
        With Regard To The Plaintiff's Second Claim, The Debtor
        Owns 100% of ACP's shares as Either His Separate Or
        Community Property. ..........................................................................29

    C.  Issue III: The Bankruptcy Court *Did Not Err* In Finding That
        With Regard To The Plaintiff's Third Claim, The Merger Of
        Coastal Into Coastal DE is Avoided Pursuant To 11 U.S.C. §

549 As An Unauthorized Transfer Of Debtor's Assets Without Court Authorization..............................................................................34

D.    Issue IV: The Bankruptcy Court *Did Not Err* In Finding That Plaintiff's Claims Were Not Time-Barred By California Civil Procedure Code § 338(a)..................................................................35

VI.   CONCLUSION............................................................................................37

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

<u>**Cases**</u>

*Estate of Bibb*
    87 Cal. App. 4th 461 (2001) ......................................................................30, 34

*In re Blasingame*
    598 B.R. 864 (BAP 6th Cir. 2019) ......................................................12, 35, 36

*Burton v. Burton*
    161 Cal. App. 2d 572 (1958) ..............................................................................22

*In Re Christoff*
    527 B.R. 624 (9th Cir. 2015) ............................................................................13

*City of Palo Alto v. O'Leary*
    510 U.S. 1041 (1994) .........................................................................................21

*City of Santa Clara v. Watkins*
    984 F.2d 1008 (9th Cir. 1993) ...........................................................................20

*Clark v. Millsap*
    197 Cal. 765 (1926) ...........................................................................................23

*Cleveland v. Groceryworks.com, LLC*
    200 F. Supp. 3d 924 (N.D. Cal. 2016) ..............................................................17

*Cortelyou v. Imperial Land Co.*
    156 Cal. 373 (1909) ...............................................................................23, 26, 27

*Dzung Chu v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*
    627 F.3d 376 (9th Cir. 2010) ............................................................................21

*Ellsworth v. National Home & Town Builders*
    33 Cal. App. 1 (1917) ........................................................................................24

*In re Goldshtadt*
    BAP No. CC-18-1333-LSTa, 2019 WL 4200802 (9th Cir. BAP
    Sept. 4, 2019) .....................................................................................................30

*Hubbard v. 7-Eleven, Inc.*
  433 F. Supp. 2d 1134 (S.D. Cal. 2006) ................................................................. 17

*Kahle v. Stephens*
  214 Cal. 89 (1931) ................................................................................................. 23

*Kennedy v. Allied Mut. Ins. Co.*
  952 F.2d 262 (9th Cir. 1991) ................................................................................ 17

*Latis Laser, Inc. v. Ice Cold Stocks, LLC*
  No. CV 08-03587-RGK, 2008 WL 11338191 (C.D. Cal. Sept. 23,
  2008) ....................................................................................................................... 23

*Estate of MacDonald*
  51 Cal. 3d 262 (1990) ............................................................................................ 30

*In re Marriage of Barneson*
  69 Cal. App. 4th 583 (Ct. App. 1999) .............................................................. 31, 33

*In re Marriage of Haratani*
  Case No. H044407, 2020 WL 1934004 (Cal. App.6th Apr. 22,
  2020) ....................................................................................................................... 30

*In re Marriage of Holtemann*
  166 Cal. App. 4th 1166 (Ct. App. 2008) ............................................................... 30

*In re Marriage of Leni*
  144 Cal. App. 4th 1087 (Ct. App. 2006) ........................................................... 31, 33

*In re Marriage of Lund*
  174 Cal. App. 4th 40 (Ct. App. 2009) ................................................................... 30

*In re Marriage of Valli*
  58 Cal. 4th 1396 (2014) ................................................................................... 29, 30

*Mary Pickford Co. v. Bayly Bros, Inc.*
  12 Cal.2d 501 (1939) ............................................................................................. 29

*Michaels v. Pacific Soft Water Laundry*
  104 Cal.App. 349 (1930) .......................................................................... 26, 27, 28, 29

*Estate of Petersen*
  28 Cal. App. 4th 1742 (Ct. App. 1994) ................................................................. 31

*In re Reuter*
   499 B.R. 655 (Bankr. W.D. Mo. 2012) .......................................................36, 37

*Sana v. Hawaiian Cruises, Ltd.*
   181 F.3d 1041 (9th Cir. 1999) ..................................................................32

*Shanik v. White Sewing Machine Corp.*
   25 Del. Ch. 371 (Del. 1941)......................................................................25

*In re SK Foods, LP*
   499 B.R. 809 (Bankr. E.D. Cal. 2013).................................................24

*Slojewski v. Polam Fed. Credit Union*
   473 F. App'x 534 (9th Cir. 2012) ....................................................16

*Stonehouse Homes LLC v. City of Sierra Madre*
   167 Cal.App.4th 531 (2008) ..................................................................26

*Town of Orangetown v. Gorsuch*
   718 F.2d 29 (2nd Cir.1983) ...........................................................36, 37

## Statutes

11 U.S.C. § 541(a) ...........................................................................35

Bankruptcy Code § 549 .............................................11, 12, 18, 22, 34

Cal. Corp. Code § 409(a)(1) ...........................................................22

Cal. Corp. Code § 409(e) ................................................................23

Cal. Family Code § 850(c)...............................................................29

Cal. Family Code § 852(a)........................................................11, 30

California Civil Procedure Code § 338(a) ................................................35

## Other Authorities

Fed. R. Civ. Pro. 56(a) ...................................................................21

Fed. R. Civ. Pro. 56(c) ...................................................................21

Fed. Rule Evid. 803(6) ............................................................................................32

Fed. Rule of Evid. 100 ............................................................................................33

House Report No. 93–650 ........................................................................................32

Fed. Rule of Evid. 1002 ..........................................................................................32

# I.
## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about defendant/debtor Robert Brower, Sr. ("Debtor")[1] and his associates' elaborate attempts to shield Debtor's assets from his creditors and, in particular, plaintiff MUFG Union Bank, N.A. ("the Bank"). Debtor represented to the Bank that he and his wife, defendant Patricia Brower, jointly owned assets totaling nearly $10 million in order to secure a $4.85 million loan for their company, Chateau Julien, Inc. ("CJ"), only to later disclose during bankruptcy that Debtor had purportedly divested himself of most of these assets via various alleged stock transfer/issuance transactions concerning defendants American Commercial Properties, Inc. ("ACP") and Coastal Cypress Corporation ("Coastal")[2]. Debtor sought to make it appear that he did not own any interest in ACP and that he only owned a minority interest in Coastal, thereby shielding from creditors the lion's share of the valuable assets owned by those entities, including nearly $6 million in net proceeds from the sale of a multi-acre Carmel wine estate property, as well as Debtor's homes in Carmel and Delaware.

---

[1] Debtor and the other appellants, Coastal Cypress Corporation (California), Coastal Cypress Corporation (Delaware), Wilfred "Butch" Lindley, Patricia Brower, Patricia Brower Trust, and American Commercial Properties, Inc., are referred to collectively as "Appellants."

[2] Coastal Cypress Corporation was originally a California corporation ("Coastal (California)"). But post-bankruptcy filing, Debtor caused Coastal (California) to merge into a Delaware corporation of the same name "Coastal (Delaware)." The distinction between the two entities is largely immaterial to the analysis herein. Accordingly, the two corporations are referred to collectively as "Coastal."

The Bank filed this adversary proceeding in the Bankruptcy Court to expose Debtor's subterfuge and has already largely prevailed.[3]  In partially granting the Bank's Motion for Summary Judgment ("MSJ"), the Bankruptcy Court ruled as follows:

- Appellant Wilfred "Butch" Lindley did not provide consideration to or for the benefit of Coastal in exchange for his purported 335,000 shares, rendering them void.[4]  (AA[5], 535:4-22.)

- 100% of appellant ACP's shares are the property of Debtor's bankruptcy estate because the purported transfer of these shares to Debtor's spouse, appellant Patricia Brower, was not sufficient to transmute the shares into Mrs. Brower's sole and separate property.  (AA 541-543:3-25.)

- As a result of the Bankruptcy Court's rulings voiding all of Messrs. Lindley and Babcock's alleged Coastal shares and voiding most of Mr. Nobles' alleged Coastal shares, Debtor owned at least 57% of Coastal's shares at the time of the post-bankruptcy-filing merger of Coastal (California) into

[3] The lingering issues as to which the Bankruptcy Court declined to grant the Bank's Motion for Summary Judgement are currently scheduled to be resolved at trial on September 2, 2020.

[4] The Bankruptcy Court also determined that 50,000 Coastal shares purportedly owned by Richard Babcock and 150,000 Coastal shares purportedly owned by Anthony Nobles were void for lack of consideration. (*See* AA 535-537:23-27.) However, those rulings are not identified as issues on appeal in Appellants' Opening Brief and Messrs. Nobles and Babcock, though included in the Notice of Appeal, did not submit an opening brief.  Accordingly, the Bankruptcy Court's MSJ ruling on their alleged Coastal stock is not the subject of this appeal.  To the extent the Court believes otherwise, the Bank requests leave to submit a supplemental brief addressing those issues.

[5] Citations to "AA" mean and refer to the Bank's Appellee's Appendix filed concurrently herewith.

Coastal (Delaware), for which no Bankruptcy Court approval was sought, much less granted.  Accordingly, the merger was set aside as a violation of Bankruptcy Code § 549.  (AA, 544-545:22-12.)

Appellants now contend these rulings were in error.  They are incorrect.

As to Coastal (and Appellants' first issue on appeal), the Coastal stock purportedly issued to Mr. Lindley was issued without consideration and is therefore void.  Though Appellants contend Mr. Lindley provided certain vaguely and belatedly described services in exchange for his purported Coastal shares, those services were provided, if at all, to one or both of two different corporations controlled by Debtor, CJ and/or Great American Wineries, Inc. ("GAW").  There is no legal authority for Appellants' apparent contention that services provided to one corporation are sufficient consideration for shares of a second corporation.  Appellants are simply attempting to avail themselves of the benefits of corporate entity status while disregarding that status when it becomes inconvenient.

As to ACP (and Appellants' second issue on appeal), Debtor alleges 100% of ACP's shares were his sole and separate property, until he gifted all of those shares to Mrs. Brower in 2000.  The putative evidence of this alleged gift was exceedingly sparse until certain documents allegedly memorializing the transfer suddenly appeared in late-2017 (over two years after Debtor represented that he had produced all such documents).  But even these belatedly produced documents – one of which is entirely inadmissible due to Debtor's inability to produce an original copy – were legally insufficient to transmute ACP's stock from Debtor's sole and separate property into Mrs. Brower's sole and separate property.  Under California Family Code § 852(a), "[a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely

affected."  None of the documents proffered by Appellants reflected any such "express declaration" of intent to transmute.

Appellants' third issue on appeal concerning "[w]hether the Bankruptcy Court erred in finding that with regard to the Plaintiff's Third Claim, the merger of Coastal into Coastal DE is avoided pursuant to 11 U.S.C. § 549 as an unauthorized transfer of Debtor's assets without court authorization," is a simple matter of math. Given the Bankruptcy Court's (correct) rulings voiding all of Messrs. Lindley and Babcock's purported shares and most of Mr. Nobles' purported shares, the net result was that Debtor owned at least 57% of Coastal at the time of the post-bankruptcy-filing Coastal (California)/Coastal (Delaware) merger.  He did not seek, much less obtain, Bankruptcy Court approval for the merger and it was therefore properly avoided by the Bankruptcy Court as a violation of Bankruptcy Code § 549.

Appellants' fourth issue on appeal – their contention that the Bank's claims in this matter are barred by the statute of limitations – is based on their mischaracterization of the Bank's claims as fraudulent transfer claims.  This argument was rejected by the Bankruptcy Court on two separate occasions – first in connection with Appellants' Motion to Dismiss at the outset of the case and second in connection with the Bank's MSJ – because the Bank has not asserted a claim to set aside fraudulent transfers.  Rather, the Bank sought declarations that alleged transactions were void (*i.e.*, had never legally occurred) and that the disputed property (*i.e.*, the ACP and Coastal shares) were therefore the property of the Debtor's bankruptcy estate.  There is no limitation upon the time within which a bankruptcy court may make a determination that certain property belongs to the bankruptcy estate.  *In re Blasingame*, 598 B.R. 864, 875 (BAP 6th Cir. 2019).

As to Appellants' fifth and final issue on appeal – their contention that Judge Hammond "erred in resolving disputed issues of fact and disputed issues of credibility at the summary judgment phase" – Appellants have not dedicated a particular section of their Opening Brief to addressing this issue.  Indeed, they do not identify anywhere in their Opening Brief which specific evidence they contend this purported issue applies to.  As best as the Bank can ascertain, Appellants appear to be mistaking Judge Hammond's determinations concerning (a) the admissibility of certain evidence proffered by the Appellants and/or (b) the legal sufficiency of certain evidence proffered by the Appellants to create a disputed issue of fact.  Appellants cannot avoid summary judgment via inadmissible evidence and/or evidence that does not, in fact, create a disputed issue of fact.

For the foregoing reasons and as further detailed below, Appellants' appeal should be denied and the Bankruptcy Court's MSJ ruling should be affirmed.

## II.

## APPLICABLE STANDARD OF APPELLATE REVIEW

Though Appellants included a section in their brief identifying five issues on appeal, they did not address the standard of review applicable to these issues.  (*See* AOB, pp. 8-9.)  "[A] bankruptcy court's grant of summary judgment [is reviewed] de novo."  *In Re Christoff,* 527 B.R. 624, 628 (9th Cir. 2015) (collecting cases).

## III.

## STATEMENT OF THE CASE AND BACKGROUND FACTS

### A.   The Browers

Debtor and Mrs. Brower have been married since 1980.  They purportedly entered into a pre-nuptial agreement dated June 11, 1980 (the "Pre-Nup"), which states that Mrs. Brower, at the time of the agreement, had "property and investments in an amount in excess of $15,000."  (AA, 39, ¶ 5; AA, 91.)  The Pre-

Nup further states that at the time of the agreement, Debtor had "property and investments in an amount in excess of $1,000,000." (*Id*.) Given the imbalance in Debtor and Mrs. Brower's finances at the time of their marriage, it is rather obvious that the Pre-Nup was primarily intended to protect Debtor's assets. Not surprisingly, there is no evidence to suggest that Mrs. Brower, during her approximately 30-year marriage to Debtor, ever actually maintained assets separate from Debtor until after Debtor filed for bankruptcy.

**B.**   **Coastal**

Coastal was founded as a California corporation in or about 1982. Debtor has been the President of Coastal for the duration of its existence. (AA, 39, ¶ 8; AA, 456:11-24.) As reflected in the minutes of its first board meeting, Coastal initially issued 105,000 shares of stock – 80,000 to Debtor and 25,000 to Mrs. Brower – purportedly in exchange for consideration of one dollar per share. (AA 40, ¶ 9; AA, 143.) Neither Debtor nor Mrs. Brower have produced any documents reflecting that Coastal actually received funds from Debtor and/or Mrs. Brower in exchange for these initial shares or the additional Coastal shares subsequently issued to them. (*Id*.) Moreover, even assuming Coastal did receive the specified funds in exchange for Debtor and Mrs. Brower's shares, neither Debtor nor Mrs. Brower have produced any documents that could be relied on to trace the source of the funds used to purchase their Coastal shares (*i.e.*, to prove that Mrs. Brower used her separate property to fund her Coastal share acquisitions). (*Id*.)

Until 2015, Coastal owned the real property commonly referred to as 8890 & 8940 Carmel Valley Road in Carmel, California (the "Wine Estate Property"), an approximately 16-acre estate that included a tasting room, wine production facility, barrel aging room, offices, outdoor event venues, and vineyards. The

Wine Estate Property was the former site of the Chateau Julien Wine Estate, which Debtor oversaw for decades as President of Chateau Julien, Inc. ("CJ"), Great American Wineries, Inc. ("GAW"), and Coastal Cypress Corporation ("Coastal"), each of which played a role in the Chateau Julien Wine Estate enterprise.  Coastal sold the Wine Estate Property along with certain equipment and other assets related to the ongoing wine estate business operations in April 2015 (*i.e.*, after Debtor filed for bankruptcy) for total consideration of $12,035,707.24.  (AA 40, ¶ 12; AA, 179-180.)  After paying secured loan balances, taxes, and various other items from escrow, Coastal received net proceeds from escrow of at least $5,827,761.46.  (*Id*.)

Appellants contend that Coastal's stock ownership is as follows: (1) Debtor (as his sole and separate property) – 230,000 shares (approx. 24%); (2) Mrs. Brower's Trust (via transfer from Mrs. Brower) – 125,000 shares (approx. 13%); (3) Mr. Lindley  – 355,000 shares (approx. 37%); (4) Mr. Nobles – 200,000 shares (approx. 21%); and (5) Mr. Babcock – 50,000 shares (approx. 5%).  As noted above and pursuant to the Bankruptcy Court's ruling on the Bank's MSJ, Messrs. Lindley and Babcock never provided any consideration to Coastal in exchange for their purported shares and Mr. Nobles did not provide any consideration to Coastal in exchange for at least 150,000 of his purported shares.[6]  Accordingly, at least

---

[6] As noted above, the Bank contends that Mr. Nobles also did not provide consideration for the 50,000 Coastal shares remaining in dispute and there is also no admissible evidence that Mrs. Brower's Trust's shares are traceable to funds that were her sole and separate property (or that Coastal received any consideration at all in exchange for the shares issued to Mrs. Brower).  However, these matters remain to be resolved by the Bankruptcy Court at trial and are not material to this appeal.

57% of Coastal is the Property of Debtor's bankruptcy estate (and should have been designated as such from the outset of Debtor's bankruptcy).

### 1.     Mr. Lindley's Alleged Coastal Shares.

Mr. Lindley admitted in his deposition that he never paid any money for his Coastal shares.  (AA, 169:14-16.)  Rather, he claims to have provided the following in exchange for his Coastal shares: "Grapes.  And assistance in acquiring grapes and helping the winery and the winemaker and other people to -- with the process of making wine."  (AA, 169:17-23.)  But Coastal did not make wine. According to Debtor and as previously determined by the Court, Coastal just owned the Wine Estate Property; GAW was the winemaker.  (AA, 151:7-19; AA, 186:17-28.)  And Mr. Lindley's actions are certainly inconsistent with those of someone who has a genuine financial interest in Coastal.  Mr. Lindley is aware that Coastal sold the Wine Estate Property and does not believe Coastal has been conducting any business since then, but he has not received any distributions from Coastal and has never received any information concerning the disposition of the proceeds from the Wine Estate Property.  (AA, 167-168:15-20 and 172:8-17.)

Debtor and Mr. Lindley belatedly (and in direct contravention of prior deposition testimony and discovery responses)[7] contended in opposition to the

---

[7] The Bank objected to the Supplemental Declarations from Debtor and Mr. Lindley offered in support of their Opposition to the MSJ conjunction as "sham affidavits" that "flatly contradict" prior discovery testimony and "provided for the sole purpose of creating a genuine issue of material fact."  *Slojewski v. Polam Fed. Credit Union*, 473 F. App'x 534, 535 (9th Cir. 2012) (holding district court did not abuse its discretion in finding a declaration submitted by a borrower in response to a credit union's motion for summary judgment was a sham affidavit as it contradicted earlier deposition testimony and declarant "made no attempt to explain his prior deposition testimony, nor did he claim he was confused during his

Bank's MSJ that Mr. Lindley's stock was validly issued because he "provided services of benefit to Coastal Cypress California back in the 1980s." (AA, 472:1-2 and 466:15-18 ("Mr. Lindley did not pay cash for his shares. Rather, he provided certain goods and services – such as certain portions of the grape crops from his grape-growing operation, and the provision of his services to assist Coastal and Chateau Julien in CJ's efforts to lease land, grow grapes, and produce wine." emphasis added).) As previously determined by the Court in the preceding adversary action concerning the dischargeability of Debtor's debt to the Bank, the three companies Debtor ran that comprised the "Chateau Julien Wine Estate" enterprise were Coastal, CJ, and GAW. But again, Coastal merely owned the land on which the Chateau Julien Wine Estate was located; it did not make or sell wine. (AA, 151:7-19.) Accordingly, none of the goods and services Mr. Lindley supposedly provided in exchange for his Coastal shares were actually provided to Coastal.

---

deposition"); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit"); *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 942 (N.D. Cal. 2016) ("[T]he sham affidavit rule permits a trial court to disregard declarations by a party which contradict his or her own discovery responses (absent a reasonable explanation for the discrepancy)"); *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1144 (S.D. Cal. 2006) (disregarding plaintiffs' submitted declarations in opposition to motion for summary judgment which contradicted prior deposition testimony and discovery responses as "A party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts."). (*See* AA, 508-509:7-5 and 512-513:5-20 and 523-524:16-15.) The Bankruptcy Court would have been well within its rights to sustain the Bank's objections to this belated "evidence" but likely chose not to do so given that the "evidence" was insufficient to create a disputed issue of fact concerning Mr. Lindley's failure to provide consideration to Coastal in exchange for his shares.

### 2.    Messrs. Nobles and Babcock Alleged Coastal Shares.[8]

As to Messrs. Nobles and Babcock, they purport to have acquired their Coastal shares in 2011.  They contend that Mr. Babcock acquired 50,000 shares by paying $10,000 himself and Mr. Nobles paying $40,000 on Mr. Babcock's behalf with both payments occurring on March 15, 2011.  (AA, 214-215:5-8 and 216-220:11-10; *and see generally* AA, 289-306.)  They further contend that Mr. Nobles acquired 200,000 shares by paying $200,000 on January 31, 2011.  (AA, 241-243:23-15.)  However, none of these payments were made to Coastal.

In point of fact, each of the payments made by Mr. Nobles – $200,000 for his own shares and $40,000 on behalf of Mr. Nobles – were made to Debtor and Mrs. Brower's personal bank account and the $10,000 payment made by Mr. Babcock was to Debtor and Mrs. Brower's other company, CJ.  (AA, 41-42 ¶¶ 16-19; AA, 307-337; AA, 210-211:14-21; AA, 244-250:20-23.)  This despite the fact that Coastal maintained its own, separate account at that time.  (*See* AA, 334-337.)  Moreover, CJ and Debtor and Mrs. Brower's respective accounts were not simply a way station for the money before it was deposited in Coastal's account.  Debtor admits that "[t]he money that Mr. Nobles and Mr. Babcock sent to [me] ultimately went to Chateau Julien, Inc."  (AA, 453:8-10.)  Debtor pulled this sleight of hand because, as he explained in deposition, "no one would invest in Chateau Julien,

---

[8] As already noted above, the Bankruptcy Court's rulings concerning Messrs. Babcock and Nobles' Coastal shares are not the subject of this appeal, but the facts relevant to the Bankruptcy Court's rulings on these issues provide helpful context for analysis of Appellants' third issue on appeal – "[w]hether the Bankruptcy Court erred in finding that with regard to the Plaintiff's Third Claim, the merger of Coastal into Coastal DE is avoided pursuant to 11 U.S.C. § 549 as an unauthorized transfer of Debtor's assets without court authorization."

Inc., because it was in such a weak financial condition.  However, Coastal would attract investors." (AA, 453:17-20.)

Appellants claim that Coastal received the benefit of Messrs. Nobles and Babcock's money because it "was booked as an accounts receivable added to the accounts receivable balance by Coastal Cypress Corporation." (AA, 453:10-13.) No written loan agreements or promissory notes between the two companies or other indicia that this was a legitimate, arm's-length transaction have ever been produced.  Debtor characterizes his book-keeping gymnastics as Coastal making "an advance" to CJ (AA, 454:14-18), but admits that CJ did not repay the money to Coastal (AA, 454-455:25-2 (Q: "Did Chateau Julien, Inc., ever repay that amount to Coastal?" A: "No, it did not.")) and never will because CJ ceased operations in 2015.  (AA, 455:8-16.)  In any case, it is indisputable that Coastal never – not for a second – possessed any of the money Messrs. Nobles and Babcock purportedly paid for their Coastal shares.

### 3.      The Coastal (California)/Coastal (Delaware) Merger.

On April 18, 2017, shortly before this adversary action was filed and over two years after Debtor filed for bankruptcy, Coastal executed a merger, the net result of which was to transform Coastal from a California corporation to a Delaware corporation, and all shareholders exchanged their shares of the California corporation for shares of the new Delaware corporation.  (AA, 128-129:6-9; Exh. 34, AA, 450-452:18-9; AA, 339-342.)  Debtor made no attempt to seek approval from the Court before directing Coastal to execute this merger.

C.    <u>ACP</u>

ACP was formed in or about 1983 (*i.e.*, after Debtor and Mrs. Brower were married).  ACP's primary current asset appears to be the townhome located at 28088 Barn Way, Carmel-by-the-Sea, CA 93923 (the "Carmel Townhouse"), which ACP acquired in or about 1991 and where Debtor and Mrs. Brower resided together until they moved to Delaware in 2016.  (AA, 130-131:10-24 and 133:5-47:4.)

There is no documentation to trace the origin of the funds Debtor used to acquire his ACP stock.  But Debtor contends that 100% of ACP's stock was his sole and separate property until November 2000, when he allegedly gifted all of the ACP stock to Mrs. Brower.  While there are a number of documents that Debtor and Mrs. Brower contend reflect this stock transfer – several belatedly produced more than two years after Debtor represented that all such documents had been produced – none of them include an express declaration from Debtor stating that the character of the ACP shares is being changed (*i.e.*, that they are being transmuted from Debtor's sole and separate property into Mrs. Brower's sole and separate property).  (*See* AA, 42 ¶¶ 21-23; AA, 344 and 346; *and see* AA, 350:21-24.)  Accordingly, the character of the ACP shares was never, in fact, changed and they remain either Debtor and Mrs. Brower's community property or Debtor's sole and separate property.  Either way, 100% of ACP is owned by Debtor's bankruptcy estate.

**IV.**
**<u>STANDARD FOR GRANTING SUMMARY JUDGMENT</u>**

On summary judgment, the Court decides questions of law. *See City of Santa Clara v. Watkins*, 984 F.2d 1008, 1012 (9th Cir. 1993), cert. denied sub

nom.; *City of Palo Alto v. O'Leary*, 510 U.S. 1041 (1994).  The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  The Court may grant summary judgment in the party's favor on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. Pro. 56(a) (emphasis added).  The burden of proof deeply influences whether the Court should grant a motion for summary judgment.  The Ninth Circuit in *Dzung Chu v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 387 (9th Cir. 2010), explained how the burden of proof affects a motion for summary judgment:

> "We are mindful of the shifting burden of proof governing motions for summary judgment under Federal Rule of Civil Procedure 56. The moving party initially bears the burden of proving the absence of a genuine issue of material fact. **Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the nonmoving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial.** This burden is not a light one. The nonmoving party must show more than the mere existence of a scintilla of evidence. The nonmoving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue. In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the nonmoving party's favor." (emphasis added, citations and quotations omitted).)

In this case, the undisputed evidence presented to the Bankruptcy Court demonstrated that the Bank was entitled to summary judgment on the issue of the

Debtor's ownership of a majority of Coastal shares (and, as a result, that the Coastal (California)/Coastal (Delaware) merger occurred in violation of Bankruptcy Code § 549) and 100% of ACP shares.  Accordingly, the Bankruptcy Court's rulings at issue in this appeal were correct and should be affirmed.

## V.
## ARGUMENT

A.    **Issue 1: The Bankruptcy Court *Did Not Err* In Finding That With Regard To The Plaintiff's First Claim, the Coastal shares of Lindley are void for lack of consideration, pursuant to California Corporation Code § 409.**

### 1.    Mr. Lindley Did Not Provide Consideration to Coastal In Exchange For His Shares.

A corporation may issue shares for consideration "consisting of any or all of the following: money paid; labor done; services actually rendered to the corporation or for its benefit or in its formation or reorganization; debts or securities canceled; and tangible or intangible property actually received by the issuing corporation or by a wholly owned subsidiary; but neither promissory notes of the purchaser (unless adequately secured by collateral other than the shares acquired or unless permitted by Section 408) nor future services shall constitute payment or part payment for shares of the corporation."  Cal. Corp. Code § 409(a)(1); *see also Burton v. Burton*, 161 Cal. App. 2d 572, 577-78 (1958) ("[T]he capital stock of a corporation is the money contributed by the corporators to the capital, and is usually represented by shares issued to subscribers to the stock on the initiation of the corporate enterprise.  It consists of the consideration received or agreed to be received in exchange for all issued stock, whether the consideration takes the form of money paid, labor done, or property actually received.").  Shares

issued in violation of these parameters "are void, and the parties receiving them do not thereby become shareholders." *Cortelyou v. Imperial Land Co.*, 156 Cal. 373, 376 (1909) (emphasis added) (citation omitted); *Latis Laser, Inc. v. Ice Cold Stocks, LLC*, No. CV 08-03587-RGK (Cwx), 2008 WL 11338191, at *2 (C.D. Cal. Sept. 23, 2008) (quoting *Cortelyou*); *see also Kahle v. Stephens*, 214 Cal. 89, 92 (1931) ("[T]the stock originally issued to them as above described was void because…it was issued without consideration."); *Clark v. Millsap*, 197 Cal. 765, 779 (1926) ("[S]hares of stock issued in violation of [the prohibition on issuing stock without consideration] are void and the parties receiving them do not thereby become shareholders.").

In this case, the Coastal shares purportedly issued to Mr. Lindley are void for lack of consideration. As detailed above, Mr. Lindley admitted he paid nothing in exchange for his Coastal shares and instead contends that he provided certain services in exchange for his Coastal shares. (AA, 169:14-23.) As a preliminary matter, and as the Bankruptcy Court noted in its MSJ ruling, "the issuance of shares to Lindley did not satisfy the requirements of Cal. Corp. Code § 409(e). Coastal's board was required to determine the fair value of Lindley's non-monetary consideration and state its determination by board resolution. Lindley provided no evidence that this occurred." (AA, 535:11-14.)

But even if Coastal's board *had* put forth a resolution concerning the value of Mr. Lindley's alleged services, the services were provided (if at all) to the winemaker arm of Debtor's Chateau Julien Wine Estate enterprise, GAW, not Coastal who merely owned the Wine Estate Property. (*Id.*; *and see* AA, 151:7-19; AA, 242:17-28; *and see* AA, 472:1-2 and 466:15-18 ("Mr. Lindley did not pay cash for his shares. Rather, he provided certain goods and services – such as certain portions of the grape crops from his grape-growing operation, and the

provision of his services to assist Coastal and Chateau Julien *in CJ's efforts* to lease land, grow grapes, and produce wine.") (emphasis added).)   Accordingly, the Coastal shares issued to Mr. Lindley are void.

Appellants cite *Ellsworth v. National Home & Town Builders*, 33 Cal. App. 1 (1917) for the proposition that "corporate stock issued in consideration of valuable services rendered and labor performed for corporation is not issued without consideration."  (Appellants' Opening Brief ("AOB"), 16.)  But that is not the scenario under which Mr. Lindley's alleged Coastal shares were purportedly issued.  Rather, Mr. Lindley purportedly received shares for providing goods and services to CJ and/or GAW, not Coastal.

Indeed, Mr. Lindley admitted in deposition (and reaffirmed in his supplemental declaration filed in support of Appellants' Opposition to the Bank's MSJ) that he could not distinguish between Debtor's various entities and he had no idea what particular entity to which he was providing services.  (*See* AA, 169-171:24-4 ("In my mind [Coastal, CJ, and GAW] were -- were all one entity, if you will…"[t]he whole operation [i.e., Coastal, CJ, and GAW] to most people, including me, was thought of because of the name of the building was Chateau Julien."); AA, 485-486:27-1 ("when I came across equipment that I thought Mr. Brower could use at one of the combined entities, I passed along the referral.") Accordingly, Appellants are seeking to benefit from their complete and total disregard for Coastal's separate entity status.  That should cannot be allowed to pass.  *See In re SK Foods, LP*, 499 B.R. 809, 840 (Bankr. E.D. Cal. 2013) (quoting *Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 300 (1985)) ("[T]he separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted.") and 841 (quoting *Palmas Assocs. v. Las Palmas Center Assocs.*, 235 Cal.App.3d 1220, 1249 (1991)) ("[I]t would be

unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity.")

### 2.    Void Shares Are Not Consideration For New Shares.

Appellants allege that the purported Coastal (California) shareholders "surrendered their old shares of Coastal California stock for their new shares of Coastal Delaware stock" and that "[t]his is sufficient consideration [for the Coastal Delaware stock]."  (AOB, 15.)  However, as detailed in the preceding sections, Mr. Lindley and others' Coastal (California) shares are void and were likewise void at the time of the Coastal (California)/Coastal (Delaware) stock exchange. Accordingly, Mr. Lindley's Coastal (Delaware) shares are likewise void for lack of consideration.

Appellants have not cited any legal authority for the proposition that void stock is sufficient consideration for new stock.  The single case cited for Defendants' apparent contention that void Coastal (California) stock was sufficient consideration for Coastal (Delaware) stock, *Shanik v. White Sewing Machine Corp.*, 25 Del. Ch. 371 (Del. 1941), contains no such holding as the stock exchanged in that case was not alleged to be void.  *See id*. at 383-84.  Mr. Lindley's Coastal (Delaware) stock is void because the Coastal (California) stock he gave in consideration for the Coastal (Delaware) stock was void.

### 3.    No Bona Fide Purchaser Defense Is Applicable To This Case.

Appellants argue that Mr. Lindley's purported Coastal shares, in spite of the fact that he did not actually provide any consideration for them, should not be deemed void because Mr. Lindley was a "bona fide" or "innocent" purchasers.

(AOB, 16-17.)  However, neither of the cases cited by the Defendants – *Cortelyou v. Imperial Land Co.*, 156 Cal. 373 (1909) and *Michaels v. Pacific Soft Water Laundry*, 104 Cal.App. 349 (1930) – actually support this argument.  Unlike this case, in both *Cortelyou* and *Michaels* the stockholders actually paid (or, as *Cortelyou* was an appeal from a demurrer, allegedly paid) consideration for their stock to the entity/person from whom they were purchasing it.

As a preliminary matter, *Cortelyou* is of limited significance to Defendants' "bona fide/innocent" purchasers defense due in part to its procedural posture; the case was on appeal from a demurrer ruling where, in all but limited circumstances, all material allegations made in the complaint are assumed to be true.  156 Cal. at 374; *and see Stonehouse Homes LLC v. City of Sierra Madre*, 167 Cal.App.4th 531, 538 (2008) ("We treat the demurrer as admitting all material facts properly pleaded and matters subject to judicial notice, but not deductions, contentions, or conclusions of law or fact.")  Accordingly, there had not been scrutiny of any evidence concerning the *Cortelyou* plaintiff's assertion that he paid consideration in exchange for his corporate shares; the allegation was simply deemed true for purposes of the demurrer analysis.

Moreover, *Cortelyou*'s facts are readily distinguishable from this case.  In *Cortelyou*, the plaintiff alleged he purchased from the defendant corporation, through its general manger, certain stock for which he paid an agreed price.  *Id*. at 374-75.  Unlike this case, to whom payment for the stock was made apparently not an issue in *Cortelyou*.  However, at the time of the transaction, the defendant corporation had already issued all of its shares to its general manager and, in light of this fact, there was a dispute concerning the plaintiff's rights to the stock.  *Id*. at 375.  Noting that the complaint was "not happily worded," the *Cortelyou* court discussed how to interpret the complaint – whether to "[t]reat[] the

complaint as averring that certain of the stock…was issued by the corporation to [its general manager] without consideration" or to "construe the complaint as alleging that the issue to [the general manager] was valid." *Cortelyou*, 156 Cal. at 376. Ultimately, the court determined that "the facts set out are sufficient to show Cortelyou's acquisition of the personal property by the purchase, and whether [the general manager] sold the same as his own, or as part of the treasury stock of the corporation, by the sale his interest in the shares, the subject of the sale, vested in Cortelyou." *Id*. at 377.

Unlike *Cortelyou*, in this case there are no alternative narratives that lead to the same result. Appellants do not allege that Mr. Lindley was purchasing Coastal stock that belonged to Debtor and therefore delivered his consideration directly to Debtor or, at his direction, one of Debtor's other companies. Rather, Appellants allege Coastal issued Mr. Lindley stock directly. But the undisputed facts show that Mr. Lindley never gave consideration to Coastal for that stock. *Cortelyou* simply does not apply to this case.

*Michaels* is similarly unavailing. *Michaels* was "an action to cancel a contract for the sale of corporate stock upon the ground that the sale violated the conditions contained in the permit [issued by] the commissioner of corporations. 104 Cal.App. at 361-62. Pursuant to a petition by three directors of the defendant corporation, the commissioner of corporations issued a permit for the corporation to "issue 30,000 additional shares from the treasury in order to liquidate outstanding indebtedness of the corporation… upon the condition that the stock should first be offered to existing stockholders in proportion to the stock then held by them." *Id*. at 353. Certain of the authorized shares were subsequently sold to two individuals (21,500 shares were purchased by defendant Thompson) and the funds paid to the corporation were used to pay off an outstanding corporate debt.

*Id*. at 354.  After the fact, one of the pre-existing shareholders filed suit, alleging that he had not been given an opportunity to purchase "his proportion of the stock from the corporation in accordance with the terms of the permit."  *Id*. at 355.

"Basing its judgment upon the finding that the three defendant directors were guilty of fraud in making the sale to Thompson, the trial court declared that all the shares of stock held by Thompson should be void, ordered the certificate to be canceled, and thus returned to the treasury of the corporation all these shares without affording Thompson any relief against the corporation."  *Id*. at 357.  The Court of Appeal reversed, noting, among other things, that "the undisputed evidence is that the president of the corporation, acting under what he deemed to be the authorization of the directors of the corporation, negotiated the sale of the stock to Thompson; that he reported the transaction to the full board of directors; that the money was thereafter received and placed in the treasury of the corporation without objection or remonstrance on the part of any member of the board; that it was thereafter used for the liquidation of an outstanding indebtedness of the corporation with the knowledge and consent of the full board of directors; that the money so received was still retained by the corporation at the time of the trial."  *Id*. (emphasis added).

The fundamental difference between *Michaels* and this case is fairly obvious – the corporation in *Michaels* actually received the funds paid for the shares in question (and used them to pay off a corporate debt) whereas Coastal did not. Nothing in *Michaels* stands for the proposition that a "bona fide/innocent" purchaser defense can be asserted in the face of a total lack of consideration, where the purported stockholder's consideration for his shares was never delivered to the issuing corporation.  To the extent Mr. Lindley believes he was misled by Debtor in connection with the issuance of Coastal shares, he might have a claim against

Debtor and/or Coastal.  *See id*. at 358 ("When a corporation issues to the public certificates of stock, regular on their face, it amounts substantially to a representation that the certificates are regular and valid.  Certificates of stock so issued by a corporation, but which were irregular or void for reasons not participated in by the stockholder, have been held to amount to a misrepresentation and fraud upon the part of the corporation officials for which the corporation is answerable.") (overruled in part by *Mary Pickford Co. v. Bayly Bros, Inc.*, 12 Cal.2d 501 (1939)).  But that does not change the fact that Coastal never received any consideration from Mr. Lindley in exchange for Coastal stock.  Mr. Lindley's Coastal stock is void.

**B.**     **Issue II: The Bankruptcy Court *Did Not Err* In Finding That With Regard To The Plaintiff's Second Claim, The Debtor Owns 100% of ACP's shares as Either His Separate Or Community Property.**

"Property that a spouse acquired during the marriage is community property unless it is (1) traceable to a separate property source, (2) acquired by gift or bequest, or (3) earned or accumulated while the spouses are living separate and apart."  *In re Marriage of Valli*, 8 Cal. 4th 1396, 1400 (2014) (internal citations omitted).  "A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence."  *Id*.  "[M]arried persons may by agreement or transfer ... [t]ransmute separate property of one spouse to separate property of the other spouse."  Cal. Family Code § 850(c).  "A transmutation of property, however, is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.  To satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being

changed." *In re Marriage of Valli*, *supra* 58 Cal. 4th at 1400 (internal citations omitted); *see also* Cal. Family Code § 852(a). "[I]n adopting the statutory transmutation requirements the Legislature intended 'to remedy problems which arose when courts found transmutations on the basis of evidence the Legislature considered unreliable.'" *Id*. at 1401 (quoting *Estate of MacDonald*, 51 Cal. 3d 262, 269 (1990); citing *In re Marriage of Benson*, 36 Cal. 4th 1096, 1106 (2005) (the transmutation statute "blocks efforts to transmute marital property based on evidence – oral, behavioral, or documentary – that is easily manipulated and unreliable.")); *and see In re Goldshtadt*, BAP No. CC-18-1333-LSTa, 2019 WL 4200802, at *3-4 (9th Cir. BAP Sept. 4, 2019) (concluding *In Marriage of Valli* "is controlling law in California" and rejecting argument that the community property presumption only applies in dissolution proceedings).

While the statute does not require any particular words of transmutation, *Estate of MacDonald*, 51 Cal. 3d at 273, courts more frequently find that an "express declaration" is present when the writing at issue is within a formally drafted document such as a deed or contract. *See Estate of Bibb*, 87 Cal. App. 4th 461, 462 (2001) (grant deed conveying real property from one spouse to both spouses as joint tenants was an "express declaration"); *In re Marriage of Lund*, 174 Cal. App. 4th 40, 51 (Ct. App. 2009) ("Agreement to Establish Interest in Property" unambiguously effected a transmutation of a spouse's separate property into community property); *In re Marriage of Holtemann*, 166 Cal. App. 4th 1166, 1172 (Ct. App. 2008) (transmutation agreement and trust which stated that the spouse's property was "hereby transmuted from his separate property to the community property" was sufficient for valid transmutation); *In re Marriage of Haratani*, Case No. H044407, 2020 WL 1934004, at *8 (Cal. App.6th Apr. 22, 2020) (concluding an "express declaration" of property transmutation existed

where agreement stated "[Husband] hereby grants to [Wife] as her sole and separate property" the property at issue.).

Conversely, when such formality is lacking, courts find that an "express declaration" is not established. *See In re Marriage of Barneson*, 69 Cal. App. 4th 583, 591 (Ct. App. 1999) (husband's written instructions to "transfer" stock into his spouse's name was not an expression that ownership of the property was being changed); *In re Marriage of Leni*, 144 Cal. App. 4th 1087, 1096 (Ct. App. 2006) (escrow instructions that community proceeds of a house sale were to be split "50/50" did not expressly declare that the character of the property was being changed); *Estate of Petersen*, 28 Cal. App. 4th 1742, 1744 (Ct. App. 1994) (mere reference of a joint tenancy on an account statement was insufficient for transmutation).

As detailed above, Debtor contends that he originally owned 100% of ACP as his sole and separate property and that he transferred that interest to Mrs. Brower on November 8, 2000. As a preliminary matter, the Bank does not concede that Debtor's interest in ACP was ever his sole and separate property prior to the purported transfer to Mrs. Brower. Among other things, Debtor never produced evidence that established his ownership of ACP was traceable to a separate property source. Moreover, Debtor's story about the share transfer to Mrs. Brower and the authenticity of the allegedly corroborating documents is not credible for a number of reasons, including the following: (a) Debtor continued to represent that he owned an interest in ACP on financials he provided to the Bank in connection with his guaranty of Chateau Julien's loan (*See* AA, 153:9-16 and 153-155:24-21); (b) Debtor's purported lack of ownership of ACP was only disclosed after the Bank sought to enforce Debtor's guaranty and Debtor filed for bankruptcy; and (c) the two key documents purportedly memorializing the transfer

did not appear until February 7, 2018 , over 2 ½ years after Debtor represented that he had produced all such documents (*See generally* AA, 54-88.).  *See also Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999) ("[c]ourts are rightfully wary when parties create self-serving documents and seek to offer them as business records."); *and see* Advisory Committee Note to the 2014 Amendment of Fed. R. Evid. 803(6) (The Committee emphasizes that the opponent is "not necessarily required to introduce affirmative evidence of untrustworthiness," instead the opponent can simply highlight the "circumstances" that suggest untrustworthiness.)  However, no evaluation of the parties' competing narratives is necessary in this case because the documents purportedly memorializing the transfer of ACP shares from Debtor to Mrs. Brower are insufficient to transmute the ACP shares into Mrs. Brower's sole and separate property.

There are only three documents produced in the Bankruptcy Court proceeding that Debtor and Mrs. Brower contend reflected the transmutation of the ACP shares from Mr. Brower's sole and separate property to Mrs. Brower's sole and separate property: (1) a typewritten letter dated November 8, 2000 stating "A GIFT OF MY LOVE" in the subject line[9]; (2) a handwritten "Happy Anniversary" card dated November 8, 2000 stating, in part "ACP is now yours"; and (3) a "stock transfer" (AOB, 18-19.)  As Appellants' counsel conceded at the MSJ hearing, the first document was inadmissible because Debtor and Mrs. Brower were unable to produce an original.  (*See* AA, 542:19-21; *and see* AA, 42, ¶ 21-22; AA, 344; AA 349:21-24.)  Rule of Evidence 1002 provides that "[a]n original writing…is

---

[9] Appellants did not submit an Appendix with the AOB, but they appear to reference this document in the AOB as "a signed note that includes the statement, 'I am proud to give you all my interest' in ACP."  (*See* AOB, 18-19; *and see* AA, 344.)

required in order to prove its content unless these rules or a federal statute provide otherwise."  A duplicate cannot be admitted in lieu of an original when "a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."  Fed. Rule of Evid. 100; and see Notes of Committee on the Judiciary, House Report No. 93–650 ("The Committee approved this Rule in the form submitted by the Court, with the expectation that the courts would be liberal in deciding that a 'genuine question is raised as to the authenticity of the original.'")

As to the second document – the "Happy Anniversary" card – it is plainly insufficient to transmute the ACP shares from Debtor's to Mrs. Brower's sole and separate property.  The language in the card – "ACP is now yours" – simply does not qualify as an "express declaration" for property transmutation purposes.  It is analogous to the informal written instructions found in *Barneson* and *Leni*.  While the card could indicate Brower's intent to transfer the property, it does not expressly provide that the characterization or ownership of the property is changed.  The mere intent to transfer property is not enough for valid transmutation without a clear expression that the spouse's interest in the property is being changed.  *See In re Marriage of Barneson*, 69 Cal. App. 4th at 590 ("Transfer is clearly not synonymous with transmutation.").  The simple phrase "ACP is now yours" is insufficient to forfeit Debtor's interest in ACP and its assets.

Nor does the "stock transfer" provide an "express declaration" sufficient for transmutation.  Share certificates proffered by the Appellants were allegedly endorsed to Mrs. Brower by Debtor, but the mere act of transferring shares does not express an intent to change the character or ownership of the property.  *See In re Marriage of Barneson*, 69 Cal. App. 4th at 590 (placement of stock belonging to one spouse in the stock brokerage account of the other spouse was not sufficient to

establish a transmutation); *Estate of Bibb*, 87 Cal. App. 4th at 469 (DMV printout reflecting the re-registration of an automobile in the name of one spouse to the name of either spouse did not show intent to transmute).

Contrary to Appellants contentions, there were no disputed issues of fact concerning the invalidity of Debtor's purported transfer of his 100% interest in ACP to Mrs. Brower as her sole and separate property.  Rather, the purported evidence of the transfer was either inadmissible or legally insufficient to grant Mrs. Brower a sole and separate interest in the shares.  Accordingly, as a matter of law, the ACP shares are the property of Debtor's bankruptcy estate.

**C.   Issue III: The Bankruptcy Court *Did Not Err* In Finding That With Regard To The Plaintiff's Third Claim, The Merger Of Coastal Into Coastal DE is Avoided Pursuant To 11 U.S.C. § 549 As An Unauthorized Transfer Of Debtor's Assets Without Court Authorization.**

Appellants argue that the Bank's third claim "must fail because it is derivative of the first two claims"  (AOB, 19.)  However, for the reasons detailed above, the Bank's MSJ was properly granted as to the first and second claims. Accordingly, Debtor owned at least 57% of Coastal at the time of the Coastal (California)/Coastal (Delaware) merger, which was executed after the filing of Debtor's bankruptcy petition.  Therefore, Debtor violated Bankruptcy Code § 549 by executing the merger without the Bankruptcy Court's authorization and in a manner not otherwise allowed by the Bankruptcy Code.  Based on the undisputed facts, the Bankruptcy Court properly set the merger aside.

D.    **Issue IV: The Bankruptcy Court *Did Not Err* In Finding That Plaintiff's Claims Were Not Time-Barred By California Civil Procedure Code § 338(a).**

The Bankruptcy Court rejected Defendants' statute of limitations defense at the pleading stage and again in connection with the Bank's MSJ.  In this case, the third time is definitely not the charm.

11 U.S.C. § 541(a) states that "[t]he commencement of a case ... creates an estate," the bankruptcy estate. That bankruptcy "estate is comprised of all ... property, wherever located and by whomever held," including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  There is no limitation upon the time within which a bankruptcy court may make a determination that certain property belongs to the bankruptcy estate.  *In re Blasingame*, 598 B.R. 864, 875 (BAP 6th Cir. 2019).

*Blasingame* is instructive.  In that case, the plaintiff in an adversary action "sought a declaratory judgment that personal property located at, in, and around the home where the Debtors reside is property of the bankruptcy estate" whereas "[t]he Debtors assert, as they have throughout the entire bankruptcy proceeding, that the personal property is held in trust or belongs to other people, such as their children, and is not property of the bankruptcy estate."  *Id*. at 869.  Citing state law creating "a rebuttable presumption of ownership which becomes conclusive after five years," the debtors argued that the plaintiff's adversary action was time-barred.  *Id*. 875.  The bankruptcy court rejected this argument and the Court of Appeal affirmed, stating as follows:  "The [adversary action] sought a determination that the personal property in, at, and around the Debtors' residence belonged to the bankruptcy estate. There is no limitation upon the time within which the Court may do this."  *Id*.

As in *Blasingame*, here the Bank seeks a declaratory judgment that certain property (specifically, Coastal and ACP stock) is property of Debtor's bankruptcy estate while the Appellants contend the stock is owned by Mrs. Brower (as her separate property) and Mr. Lindley.  Appellants' statute of limitations defense amounts to a contention that property belonging to the Debtor held in the name of these individuals is exempt from inclusion in Debtor's bankruptcy estate if the individuals have held the subject property in their own name for more than three years.  As detailed above, that is not the law.  Under *Blasingame*, it does not matter how long a third party has supposedly held property of the bankruptcy estate in its own name; the date on which the third party supposedly acquired the property has no bearing on the Court's ability to determine whether that property belongs to the estate.

Appellants assert that *Blasingame* does not apply to this case by citing, for the first time on appeal, *In re Reuter*, 499 B.R. 655, 667-68 (Bankr. W.D. Mo. 2012).  Appellants claim the court in *In re Reuter* "acknowledged the general rule that 'if a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, that specific period of time will govern.'"  (AOB, 20.)  No such "general rule" is announced in *Reuter*. Indeed, the cited text merely reflects the court acknowledging, but not adopting, the debtor's argument.  *See In re Reuter*, 499 B.R. at 667-68 ("For example, [debtor] cites *Town of Orangetown v. Gorsuch*, 718 F.2d 29 (2nd Cir.1983), for the proposition that if a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, that specific period of time will govern. That case is distinguishable for several reasons.")

Contrary to Defendants' contention, *In re Reuter* actually supports the Bankruptcy Court's determination that the statute of limitations ***does not*** bar the

Bank's claims.  Like the Bankruptcy Court in this case, the court in *In re Reuter* determined "this is not a fraudulent transfer claim disguised as a declaratory action claim and the statute of limitations as to § 544 actions is not applicable." *Id.*  Like the claims in *In re Reuter*, the Bank's claims in this case "are causes of actions unto themselves and nowhere in the Complaint has Plaintiff attempted to plead an avoidance action, the statute of limitations for the claims actually pled is what is at issue." *Id.*  As the Bankruptcy Court stated in granting the Bank's MSJ, "[the Bank] does not seek to void the alleged stock transfers. Rather, Plaintiff seeks a finding that no transfers occurred at all. This is a determination the court may make at any time." (AA, 544:9-11.)

Appellants' statute of limitations defense should be roundly rejected for the third time.

# VI.
# CONCLUSION

For the foregoing reasons, the Bankruptcy Court's rulings – granting the Bank's MSJ in part and ruling that Mr. Lindley's alleged Coastal shares and Mrs. Brower's allegedly separately-owned ACP shares are property of Debtor's bankruptcy estate – should be affirmed in their entirety.

Dated:  April 24, 2020

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By _____
                     */s/ Isaiah Z. Weedn*
                ISAIAH Z. WEEDN
                Attorneys for Respondent
                MUFG UNION BANK, N.A.

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Isaiah Z. Weedn, certify that, pursuant to Federal Rule of Bankruptcy Procedure 8015(h), appellee MUFG Union Bank, N.A.'s Opening Brief is prepared in Times New Roman font, 14-point, and contains 9,424 words, exclusive of the cover page, tables, corporate disclosure statement, signature block, this certificate, and the proof of service (*i.e.*, the portions exempted by FRBP 8015(g)).  In making this certification, I am relying on the word count of the computer program used to prepare the brief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  April 24, 2020

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By        */s/ Isaiah Z. Weedn*
              ISAIAH Z. WEEDN
           Attorneys for Respondent
           MUFG UNION BANK, N.A.

## <u>CERTIFICATE OF SERVICE</u>

**United States District Court, Northern District of California
Case No. 5:19-cv-08135-EJD**

I am employed in the County of Orange; I am over the age of eighteen years and not a party to the above entitled action; my business address is 650 Town Center Drive, 10th Floor, Costa Mesa, California 92626.

On April 24, 2020, I served the following document(s) described as **APPELLEE MUFG UNION BANK, N.A.'S OPENING BRIEF** on the interested party(ies) in this action by CM/ECF Notice Of Electronic Filing.  I electronically filed the document with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*Attorneys for Robert Brower, Sr.; Coastal Cypress Corporation (California and Delaware); Wilfred "Butch" Lindley; Patricia Brower; Patricia Brower Trust; American Commercial Properties, Inc.*
Stephan A. Barber
JRG ATTORNEYS AT LAW
318 Cayuga Street
Salinas, CA 93901
Tel: 831.754.2444; Fax: 831.269.7089

*Attorneys for Richard Babcock and Anthony Nobles*
Babak Samini
THE SAMINI FIRM APC
2801 West Coast Highway, Suite 200
Newport Beach, CA  92663
bsamini@saminilaw.com
Tel: 949.724.0900

*Served via U.S. Mail*
Judge M. Elaine Hammond
U.S. Courthouse, Room 3035
280 S. First St.
San Jose, CA 95113

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office

SMRH:4822-3091-7818.1

-39-

of a member of the bar of this Court at whose direction the service was made. Executed on April 24, 2020, at Costa Mesa, California.

/s/ Carole Dubienny

Carole Dubienny